**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

FREDDIE MOHLKE                                                                                    PLAINTIFF

v.                                      No. 4:10CV01995 JLH

METROPOLITAN LIFE
INSURANCE COMPANY                                                              DEFENDANT

## OPINION AND ORDER

Freddie Mohlke brings this action against Metropolitan Life Insurance Company to recover

disability benefits that he alleges are due under the long-term disability plan provided to him by his

former employer, Eastman Chemical Company, pursuant to the Employment Retirement Income

Security Act of 1974, 29 U.S.C. § 1001 *et seq.* MetLife is the Claims Administrator of the Eastman

Long-Term Disability Plan and has the authority to determine eligibility for benefits under the Plan.

Mohlke applied for long-term disability benefits in 2006. MetLife found that he was disabled and

approved his claim on November 8, 2006. In 2009, MetLife found that Mohlke was no longer

disabled and terminated his benefits, a decision that Mohlke has appealed to this Court. For the

following reasons, MetLife's decision to terminate Mohlke's long-term disability benefits is

affirmed.

## I.

In 1992, Mohlke began working as a Maintenance Mechanic at Eastman Chemical Company.

Met-M-532. In that position, Mohlke was "responsible for mechanical repair of all equipment

plantwide until 2004." He "was then transferred to the fork truck shop where he [was] responsible

for about 30 pieces of motorized rolling stock and about 200 pieces of non-motorized buggies." *Id.*

In August of 2006, Mohlke went on sick leave and, subsequently, filed for long-term

disability benefits pursuant to the Eastman Long-Term Disability Plan. Met-M-1. According to

Mohlke's "Personal Profile" he was unable to work because he "had an abnormal ENG test with 81% weakness of the right vestibular nerve whereas a maximum of 20% is allowable for normal functionality." Met-M-527. Mohlke explained that his condition did not affect his sleep but that he tired easily and suffered from headaches. Met-M-528. His day was primarily taken up with physical therapy. *Id.* Mohlke stated that he could not work because of his "unsteadiness/dizziness." Met-M-529. He indicated that his physician had not restricted his driving and that he was still able to walk, read, and care for his household. Met-M-530. Mohlke identified four treating medical professionals: Dr. Todd Rumans, an otolaryngologist; Dr. Robert Hale, an audiologist; Betty Bradley, a physical therapist; and Dr. Seth Barnes. Met-M-514, 527.

MetLife collected medical records and information from Mohlke's treating professionals. *See* Met-M-438-44, 519-23, 534-59. According to those records, Mohlke began to suffer from dizziness in May of 2006. On July 5, 2006, Mohlke's complaints of dizziness were evaluated by Dr. Rumans. Met-M-542. Dr. Rumans's notes indicate that Mohlke reported that for the previous two months he had suffered from episodes during which his head would spin and he would lose his balance for a few seconds, typically when he moved or changed positions. Mohlke also complained of blurred vision. Dr. Rumans assessed Mohlke as suffering from benign paroxysmal positional vertigo and moderately severe high frequency sensorineural hearing loss bilaterally. Dr. Rumans performed Epley maneuvers which appeared to reduce Mohlke's symptoms. *Id.* On July 12, 2006, Dr. Rumans again visited with Mohlke and concluded that his dizziness had greatly improved, but that he continued to suffer from loss of balance when walking or turning. Met-M-541. Dr. Rumans scheduled Mohlke for an MRI. *Id.* The MRI revealed normal internal auditory canals and normal brain condition. Met-M-555-56.

2

When Mohlke visited Dr. Rumans on July 25, 2006, he complained that his dizziness had grown worse. Met-M-540. Dr. Rumans indicated that testing was negative for benign paroxysmal positional vertigo. He recommended ENG testing, which was performed by Dr. Hale. During the follow-up visit on August 8, Dr. Rumans noted that Mohlke's ENG was abnormal—revealing eighty-one percent weakness of the right vestibular nerve—and cautioned him "to avoid any situations which require normal balance for safety such as climbing on ladders or working on elevated structures." *Id.*; *see also* 556. Mohlke continued to complain of dizziness. Dr. Rumans also recommended "vestibular nerve rehab." *Id.* Mohlke received vestibular rehabilitation therapy from Bradley, and showed some improvement. Met-M-534.

On October 11, 2006, Mohlke was examined by Dr. Hale who wrote an ENG report stating that Mohlke now had ninety-six percent right unilateral caloric weakness. Met-M-535. Dr. Rumans then examined Mohlke and recommended continued therapy. Met-M-523. Dr. Rumans stated that Mohlke would need to avoid any work situations that require normal balance for safety and that Mohlke could not return to work unless he could be cleared one hundred percent with no restrictions. Dr. Rumans explained that Mohlke's vestibular nerve weakness prevented one hundred percent clearance. *Id.*

Two days later, Dr. Rumans filled out a "physician statement" indicating that Mohlke suffered from right vestibular nerve weakness, hyper labyrinth-unilateral, and hearing loss-sensorineural. Met-M-519-21. Dr. Rumans reiterated his opinion that Mohlke should avoid any situation that requires normal balance such as climbing ladders and working in elevated positions. However, Dr. Rumans stated that Mohlke was able to function under stress and engage in interpersonal relations as well as to sit, stand, or walk continuously. Mohlke could reach above

shoulder level, but could not climb, twist, bend, or stoop.  He had no cardiac functional limitations. Rumans noted that, apart from the balance issues, Mohlke could perform other activities at full capacity.  *Id.*

Based on this evidence, MetLife approved Mohlke's claim for disability benefits on November 8, 2006.  Met-M-507.  In its letter, MetLife explained that it would request periodic updates concerning Mohlke's medical information from his attending physician.  *Id.*  The record reflects such periodic updates.

On November 29, 2006, Mohlke complained to Dr. Rumans about headaches.  Met-M-444. Dr. Rumans noted that a previous MRI revealed no abnormalities, but recommended that Mohlke meet with Dr. Seth Barnes.  *Id.*  Dr. Barnes stated in a letter dated January 31, 2007, that Mohlke suffered from dizziness orthostasis, vertiginous symptoms, and difficulty orienting in space, and that these ailments would likely not improve and did interfere with his ability to work.  Met-M-482.

In February of 2008, Mohlke underwent another ENG test that revealed abnormal results: one hundred percent caloric weakness in his right ear.  Met-M-446.  Dr. Rumans met with Mohlke on February 15, 2008, and expressed the opinion that Mohlke's condition was essentially unchanged.  Met-M-447.  Dr. Rumans indicated that Mohlke should continue to avoid any position requiring normal balance and that he should avoid situations requiring him to lift heavy objects because of the risk of falling.  However, Dr. Rumans found that Mohlke's motor strength remained intact.  *Id.*  Dr. Rumans completed a functional capacity statement in which he noted that Mohlke should avoid the following completely: stairs/ladders, scaffolds/heights, assuming cramped/unusual positions, reaching (forward/overhead), repetitive movement (hands/feet), climbing (stairs/ladders/scaffolds), balancing (exposure to falling), bending/stooping/squatting, operating

truck/dolly/small vehicle, operating heavy equipment, and concentrated visual attention.  Met-M-455-56.  Mohlke had some limitation in the following: transportation, standing, sitting, change of position (sitting/standing), pushing/pulling/twisting (arm/leg controls), and grasping/handling. Mohlke, however, had no limitation as to the following: dust/gases/fumes, chemicals/solvents, temperature extremes, noise levels, allergenic agents, enclosed spaces, drafts/damp areas, finger dexterity, operating electrical equipment.  Dr. Rumans wrote that Mohlke's "limitation is only regarding balance—not strength."  Dr. Rumans checked a box to indicate that Mohlke had no psychological problem.  Finally, Dr. Rumans said, "this is a chronic/permanent condition based on serial exams."  *Id*.

In March of 2009, Dr. Barnes completed a functional capacity statement indicating that Mohlke should avoid the following completely: temperature extremes, noise levels, allergenic, stairs/ladders, scaffolds/heights, enclosed spaces, drafts/damp areas, reaching (forward/overhead), operating heavy equipment, operating electrical equipment, and concentrated visual attention.  Met-M-434-45.  Dr. Barnes indicated that Mohlke suffered from severe depression and anxiety. Dr. Barnes stated that Mohlke's depression had retrogressed requiring antidepressant doses. Dr. Barnes stated that Mohlke was totally disabled.  *Id*.  On March 18, 2008, Dr. Rumans met with Mohlke who complained of twitching in his left ear that dissipated once he put pressure on it.  Met-M-388.  Dr. Rumans completed another functional capacity form in March of 2009.  Met-M-436-37. His findings and comments were the same as those expressed on his 2008 form.  *Id.*

In May of 2009, an anonymous letter was sent to Future Fuel, the entity that owns the facility at which Mohlke worked when it was owned by Eastman.  Met-M-420.  The letter ultimately was forwarded to MetLife.  The letter stated, in full:

> Even though he was not medically able to work for Eastman/ Future Fuel, it looks like Mr. Mohlke has made a remarkable recovery, and is now able to work again. It appears he is using the training you provided him with, and the tools he stole from the company to make a few bucks on the side. If it were my company, I would pursue criminal charges against Mr. Mohlke, not only for stolen property, but perhaps insurance fraud.

Met-M-422. Attached to the letter was an letter from Southside Public Water Authority, dated April 8, 2008, listing Mohlke as a "Certified Assembly Tester." Met-M-423.

After receiving a copy of the anonymous letter, MetLife retained private investigators to observe Mohlke in order to document his daily activities and current level of function. Met-M-8. The investigators first observed Mohlke's wife working at Southern Income Tax & Accounting Services in Batesville Arkansas. Met-M-55. The next day, the investigators discovered Mohlke at that business. Met-M-56. The investigators observed Mohlke driving, running errands, and walking normally. At one point, Mohlke briefly entered a Batesville water company, then drove to a bank and used the drive-through window. *Id.* The investigators also contacted Southside Water and learned that Mohlke was one of their RPZ testers. Met-M-69. The investigators called Mohlke's wife who stated that he was a certified tester but could not come to the phone because he was working on his tractor. *Id.* The investigators eventually made contact with Mohlke who stated that he was retired from Eastman Chemical but that he had begun RPZ testing a couple of years before his retirement and was certified for RPZ testing and repair. Met-M-70. He stated that he charged sixty dollars to perform an inspection. Mohlke also stated that he did not actively advertise his services but merely did this work on the side from time to time. *Id.*

In September of 2009, MetLife referred Mohlke's entire file to a board certified otolaryngologist, Dr. Thomas Klein, for an independent assessment of whether Mohlke's medical conditions interfered with his ability to work. Met-M-383-86. Dr. Klein concluded that there was

"a lack of objective findings on physical examination that support the need of restrictions and limitations in work activities" beyond August, 27, 2009.  Dr. Klein noted that Mohlke had a history of benign positional vertigo, "which was severe and bilateral sensorineural hearing loss," and which did not change over two years.  Dr. Klein further noted that Mohlke's physicians had provided the appropriate care and treatment, and that Mohlke had been compliant with the treatment plan.  However, Dr. Klein found that there was no clinical documentation available from the treatment providers that "clearly details any significant or severe positive objective findings or significant severe functional limitations occurring that would have prevented return back to regular job activity" after August of 2008.  He noted that at the time of Mohlke's March of 2008 visit, there "was no documentation of vertigo and no documentation of any nystagmus."  Dr. Klein stated in his report that he conversed with Drs. Rumans and Barnes.  Dr. Rumans told Dr. Klein that he was not aware that Mohlke had a job but that if he did have a job then he was not disabled.  Dr. Rumans reported that Mohlke had communicated with him in February of 2009 that his condition had not improved.  Dr. Barnes reported that he saw Mohlke every six months but that Dr. Rumans was the primary physician following Mohlke.  Dr. Barnes stated that Mohlke's complaints were consistent with a finding of vertigo.  *Id.*

MetLife forwarded Dr. Klein's report to Drs. Rumans and Barnes and asked if they agreed with it.  Dr. Barnes did send a response to a August of 2009 inquiry from MetLife in which he indicated that Mohlke suffered from worsening depression, social anxiety, and agoraphobia.  Met-M-375-76. Dr. Barnes indicated that these problems imposed limitations on Mohlke's ability to sit, stand, walk, climb, twist, bend, stoop, reach above shoulder level, and lift heavy objects.  However,

Dr. Barnes did not mention vertigo or vestibular nerve weakness.  *Id.*  Otherwise, neither Drs. Rumans or Barnes responded to MetLife's request for a comment on Dr. Klein's report.

Based on this evidence, MetLife concluded that Mohlke no longer met the Plan's definition of disability.  MetLife sent two letters to Mohlke informing him that his disability benefits would cease and explaining the basis of that decision.  Met-M-363-65, 369-72.  MetLife explained that Mohlke could appeal this decision and could provide additional documentation in support of his appeal.  *Id.*  In December of 2009, Mohlke communicated to MetLife his intent to appeal the decision.  Met-M-367.  Mohlke requested a copy of his file and of Eastman's policy definition of "gainful work."  *Id.*  In response, MetLife provided the requested file.  Met-M-366.  Mohlke subsequently appealed the decision.  Met-M-359.  In his appeal, Mohlke asserted that MetLife did not furnish him with any substantive material from his file to support termination of benefits as defined by the guidelines set forth in the Plan.  Mohlke also stated that he had no additional medical records to submit but that his condition had been termed "permanent."  He noted that the Random House Dictionary defined "permanent" as "lasting forever."  *Id.*

Subsequently, MetLife referred Mohlke's file to another board certified otolaryngologist, Dr. Ronald Grossman, for independent review.  Dr. Grossman wrote a report in which he stated that the medical information did not support any functional limitation beyond November 19, 2009.  Met-M-295-98.  Dr. Grossman stated that the medical records of Drs. Rumans and Barnes demonstrated a progressive loss of the right vestibular system with associated symptoms of intermittent vertigo but that this condition had ameliorated to the degree that Mohlke had no further supporting clinical findings.  Dr. Grossman explained that the body often compensates for unilateral vestibular loss with other balance mechanisms.  Dr. Grossman found that these other balancing mechanisms "obviously

are in place at this point in time" for Mohlke as "he has been observed to go about his daily activities with no apparent difficulty and to be gainfully employed, albeit on a part-time basis." Consequently, Dr. Grossman concluded that the objective findings did not support Mohlke's subjective complaints and did not impose any limitations on Mohlke's ability to perform  heavy lifting, sitting, standing, walking, being in cramped or unusual places, bending, stooping, squatting, using precise verbal and written communications, and maintaining visual and auditory attention.  Dr. Grossman did find that Dr. Rumans's records were excellent, that Mohlke had received appropriate treatment, and that he had complied with his treatment plan.  However, Dr. Grossman was unable to contact Dr. Rumans. He did contact Dr. Barnes.  Dr. Grossman reported that Dr. Barnes was cooperative and related that Mohlke's symptoms were subjective with no corroborating physical findings.  Dr. Barnes noted that Mohlke appeared stable, and could walk as well as drive without problems.  *Id.*

MetLife also referred Mohlke's case to a psychiatrist, Dr. Peter Sugerman, who wrote a report.  Met-M-285-87.  Dr. Sugerman spoke with Dr. Barnes who stated that he had previously noted Mohlke's depression and that his diagnosis was based on Mohlke's description of agoraphobia and situational anxiety.  Dr. Barnes stated that Mohlke had responded nicely to the Lexapro and that he had been psychiatrically stable when he had come in for an office visit about one year prior.  Dr. Sugerman found that the medical information did not support any psychiatric functional limitations beyond November 19, 2009.  Dr Sugerman explained that there was no documented evidence of severe psychiatric symptoms supported by objective data and associated with global functional limitations.  He noted that Mohlke had not been evaluated by a health provider since March of 2009. He concluded that there was no evidence linking Mohlke's reported symptoms with any decrease in functions needed to perform common work tasks.  Dr. Sugerman found that Mohlke had received

proper care for an incapacitating mental health disorder, assuming that he actually suffered from one, but noted that at the time he wrote the report no active mental health services appeared to be in place.  Dr. Sugerman stated that even if Mohlke were still taking Lexapro or Celexa it was unlikely that he would be experiencing any impairment due to the medication.  *Id.*

MetLife provided a copy of Dr. Grossman's report to Dr. Rumans, and a copy of Dr. Sugerman's report to Dr. Barnes.  Met-M-269-78.  MetLife asked the physicians to provide responses if they disagreed with the conclusions in the report.  Neither physician responded.  Metlife also sent a letter to Mohlke informing him that the reports had been forwarded to the physicians but that neither had responded and asking him to follow up with his physicians.  Met-M-284.  Still, neither physician responded.  Based on the evidence, MetLife affirmed the decision to discontinue disability benefits.  Met-M-258-61.  MetLife found "that the clinical medical documentation does not support restrictions and limitations to preclude occupational functioning beyond November 19, 2009."  MetLife also informed Mohlke of his right to file suit pursuant to the ERISA.  *Id.*  Mohlke timely filed this action appealing MetLife's decision to discontinue benefits.

## II.

Section 502(a)(1)(B) of the ERISA provides that "a participant or beneficiary" may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

Where the plan administrator has the discretion to construe the plan's terms, the district court normally reviews "the administrator's interpretation under an abuse of discretion standard."  *Jones*

*v. ReliaStar Life Ins. Co.*, 615 F.3d 941, 945 (8th Cir. 2010) (citing *Firestone Tire & Rubber Co. v.*

*Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989)).  Here, the Plan states:

**11.1   Plan Administrator**

> **(a)   Responsibility of Plan Administrator.**   The Plan Administrator shall have total and exclusive responsibility to control, operate, manage and administer the Plan in accordance with its terms.

> **(b)   Authority of the Plan Administrator.**   The Plan Administrator shall have all the authority that may be necessary or helpful to enable him to discharge his responsibilities with respect to the Plan.  Without limiting the generality of the preceding sentence, the Plan Administrator shall have the exclusive right: to interpret the Plan (but not to modify or amend the Plan); to determine eligibility for Coverage; to determine eligibility for Benefits; to construe any ambiguous provision of the Plan; to correct any default, to supply any omission; to reconcile any inconsistency; and to decide any and all questions arising in the administration, interpretation, and application of the Plan (including, but not limited to deciding questions of fact).

> **(c)   Discretionary Authority.**   The Plan Administrator shall have full discretionary authority in all matters related to the discharge of his responsibilities and the exercise of his authority under the Plan including, without limitation, his construction of the terms of the Plan and his determination of eligibility for Coverage and Benefits.  It is the intent of the Plan that the decisions of the Plan Administrator and his action with respect to the Plan shall be conclusive and binding upon all persons having or claiming to have any right or interest in or under the Plan and that no such decision or action shall be modified upon judicial review unless such decision or action is proven to be arbitrary or capricious.

> **(d)   Delegation of Authority.**   The Plan Administrator may delegate some or all of his authority under the Plan to any person or persons provided that any such delegation shall be in writing.

Met-M-599, 638.

**11.3   Claims and Appeal Procedures**

* * *

> **(e)   Claims Administrator's Authority.**   In processing Claims and appeals pursuant to Sections 11.3 of the Plan, the Claims Administrator shall have the discretionary authority and control to make factual determinations and all

of the discretionary authority and control of the Plan Administrator as set forth in Sections 11.1(b) and 11.1(c).

Met-M-623.  The Plan provides MetLife with the discretionary authority to construe its terms.

Mohlke argues, nevertheless, that the Court should review the decision *de novo* because Metlife (1) failed "to provide a complete copy of the administrative record" to Mohlke upon his request; (2) failed "to cite the applicable Plan provision in its determination;" (3) immediately terminated Mohlke's benefits in violation of the plan; and (4) failed "to have safeguards in place to assure consistent decisions."  Later, Mohlke appears to argue that *de novo* review is warranted because (5) MetLife erred in its determination that Mohlke could perform gainful work because it did not consider the "local economy" requirement, Met-M-616-17; (6) MetLife erred by relying on the lack of objective evidence because the Plan imposes no objective evidence requirement; and (7) MetLife failed to explain to Mohlke what information was needed to establish disability, as required under the terms of the Plan, Met-M-600-01, 621-22.  Mohlke offers no legal authority for the proposition that any of these allegations alter the standard of review.[1]

Even if the plan or policy grants discretion, however, the Eighth Circuit has held that a less deferential standard of review is warranted if a plaintiff can provide material, probative evidence to demonstrate "that: (1) . . . a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty . . . ."  *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S.

_____

[1] Mohlke does cite the five-factor test from *Finley v. Special Agents Mut. Ben. Ass'n, Inc.*, 957 F.2d 617, 621 (8th Cir. 1992).  That test is not used to determine the appropriate standard of review.  Rather, the *Finley* factors guide a court's decision regarding whether a plan administrator's interpretation of disputed plan provisions is reasonable.

Ct. 2343, 171 L. Ed. 2d 299 (2008).[2]   Under the *Woo* test, the "mere presence of a procedural

irregularity is not enough to strip a plan administrator of the deferential standard of review."

*McGarrah v. Hartford Life Ins. Co.*, 234 F.3d 1026, 1031 (8th Cir. 2000), *abrogated on other

grounds by Glenn*, 554 U.S. 105, 128 S. Ct. 2343.   The procedural irregularity must also raise

"serious doubts as to whether the result reached was the product of an arbitrary decision or the plan

administrator's whim."   *Buttram v. Cent. States Se. & Sw. Areas Health & Welfare Fund*, 76 F.3d

896, 900 (8th Cir. 1996).   This second requirement is a "considerable hurdle" for plaintiffs.   *Torres

v. UNUM Life Ins. Co. of Am.*, 405 F.3d 670, 679 (8th Cir. 2005) (quotation omitted).

Mohlke's third, fifth, and sixth reasons for *de novo* review are not "procedural" in nature but

rather are disagreements with MetLife's interpretation and application of the Plan's terms.   *See

Weidner v. Fed. Exp. Corp.*, 492 F.3d 925, 928-29 (8th Cir. 2007) ("These contentions are without

merit because they reflect substantive disagreements with the Committee's analysis of the

administrative record, not procedural irregularities.").   Consequently, these allegations do not affect

the standard of review.   The Court will address them on the merits below.

---

[2] *Glenn* abrogated the *Woo* test with respect to conflicts of interest.   *Glenn*, 554 U.S. at 108, 128 S. Ct. at 2346 (holding that "a reviewing court should consider [a conflict of interest] as a factor in determining whether the plan administrator has abused its discretion in denying benefits").   It remains to be seen, however, whether *Glenn* affected *Woo's* holding that a procedural irregularity may change the standard of review.   *Compare Wakkinen v. UNUM Life Ins. Co. of Am.*, 531 F.3d 575, 581-82 (8th Cir. 2008) (explaining that, even under *Glenn*, the Eighth Circuit continues to examine procedural irregularities under the two-part *Woo* test), *with Chronister v. Unum Life Ins. Co. Of Am.*, 563 F.3d 773, 776-77 (8th Cir. 2009) (analyzing procedural irregularities as factors under *Glenn's* abuse of discretion standard).   *See also Wrenn v. Principal Life Ins. Co.*, 636 F.3d 921, 924 n.6 (8th Cir. 2011) (explicitly declining to decide whether *Glenn* changed the *Woo* procedural irregularity test, but noting that *Woo* may still apply in the Eighth Circuit).   This Court will continue to apply *Woo* to procedural irregularities so long as that portion of *Woo* has not been overruled.

Mohlke argues that the Court should conduct a *de novo* review because MetLife failed to provide him with a copy of "the surveillance video and investigation as part of the administrative record" and "to define 'Gainful Work.'" Mohlke's complaint that MetLife did not define "Gainful Work" is without merit because that term is defined in the Plan itself. Met-M-567. Further, MetLife asserts that it provided Mohlke with a complete copy of his file after the investigation was performed. MetLife cites a letter dated January 11, 2010 and addressed to Mohlke, stating that his "claim file" was attached.[3] Met-M-366. At that time, Mohlke had already received the letter, dated November 19, 2009, making reference to the investigation. Although Mohlke knew of the investigation and had requested a copy of all video-recorded evidence, there is no evidence on the record that Mohlke complained to MetLife that he did not receive the items he had requested. Based on this record, the Court cannot find that MetLife failed to send Mohlke the entire claim file. *See Kerr v. Charles F. Vatterott & Co.*, 184 F.3d 938, 947 (8th Cir. 1999) ("[T]here is a general rebuttable presumption that a properly mailed document is received."). Furthermore, MetLife's decisions, as well as the physicians' reports, clearly state that the investigation was relied upon to establish that Mohlke could drive, walk, run errands, and engage in part-time work. At no point has Mohlke contested the accuracy of these factual findings. Therefore, even assuming that Mohlke did not receive a copy of the investigation and that such an omission constitutes a procedural irregularity, that omission does not give rise to "serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim." *Chronister v. Baptist Health*, 442 F.3d 648, 655 (8th Cir. 2006); *see also Tillery v. Hoffman Enclosures, Inc.*, 280 F.3d 1192, 1198

---

[3] This letter was sent in response to Mohlke's first request for his file.

14

(8th Cir. 2002) (failure to provide requested documents is harmless where claimants fail to explain how such an oversight affected their substantive rights or the decision of the plan administrator).

Mohlke also argues that the Court should conduct a *de novo* review because MetLife failed to cite the applicable plan provision and, in fact, cited a non-controlling provision, the summary plan description, which is superseded by the plan language. Met-M-565. Mohlke's allegation is based on the letter he received from MetLife informing him of its initial determination to terminate benefits. That letter states: "We have determined that your claim does not meet the criteria for benefits, as set forth in the Eastman Chemical Company Summary Plan Description." Met-M-363, 369. MetLife explains that the reference to the summary plan description was an inadvertent misstatement and that the claim file does not actually contain a summary plan description.[4] Further, the letter itself explicitly cites the Plan language and quotes Plan terms. *Id.* Mohlke offers no evidence tending to rebut this explanation. Again, assuming that this mistake was a procedural irregularity, Mohlke has not overcome the "considerable hurdle" of the second prong of the *Woo* test. *Torres*, 405 F.3d at 680.

Furthermore, Mohlke was entitled to appeal and did appeal MetLife's initial determination for a full and fair review. Met-M-623. The Plan provides that the persons conducting the appellate review may not include individuals who were involved in or subordinate to anyone involved in the initial determination. Met-M-623. The reviewers are to show no deference to the initial decision

---

[4] Mohlke appears to argue that the reference to the summary plan description constitutes an attempt to amend the Plan orally or informally. This contention is without merit because the record shows that the reference to the summary plan description was an inadvertent misstatement, not an attempt by MetLife to import new standards into the disability benefits determination. *Cf. Everest Capital Ltd. v. Everest Funds Mgmt., L.L.C.*, 393 F.3d 755, 764 (8th Cir. 2005) (in different context, no abuse of discretion to ignore an inadvertent misstatement).

and are to consult with a qualified health care professional. *Id.* MetLife's decision on Mohlke's appeal correctly references the Plan and does not reference any summary plan description. Met-M-158-61. Consequently, to the extent MetLife erred in referencing the summary plan description in its initial determination, that error was rectified by MetLife's decision, following a *de novo* review, which did not erroneously refer to any summary plan description. *Cf. Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995) (ERISA remand not required where it would be a "useless formality"); *Back v. Danka Corp.*, 335 F.3d 790, 792 (8th Cir. 2003) (purpose of administrative remedies is to allow plan administrator "to obtain full information about a claim for benefits, to compile an adequate record, and to make a reasoned decision.").

Next, Mohlke seeks a *de novo* review because MetLife allegedly failed to have safeguards to ensure consistent decisions. Mohlke cites a letter from MetLife's counsel stating that "MetLife did not rely on any particular internal rule or guideline in evaluating Mr. Mohlke's claim for benefits." Document #27-1. Upon an adverse benefits determination, the regulations require a plan administrator to provide copies of documents, records, and other informant relevant to the claimant's claim. 29 C.F.R. § 2560.503-1(i)(5), (j)(3). Further, the regulations require employee benefit plans to "establish and maintain reasonable procedures governing the filing of benefit claims, notification of benefit determinations, and appeal of adverse benefit determinations." *Id.* at 2560.503-1(b). These procedures must "contain administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants." *Id.* at 2560.503-1(b)(5). Here, the Plan itself contains procedures governing MetLife's benefits determinations. Met-M-560-645. Apart from his conclusory allegations, Mohlke

16

has not identified any way that the Plan's procedures and safeguards fail to ensure that its provisions are applied consistently with respect to similarly situated claimants.

Of course, if the plan administrator relies upon an internal rule, guideline, protocol, or other similar criterion in making the adverse determination, it must be provided to the claimant. 29 C.F.R. § 2560.503-1(j)(5)(i). However, the regulations impose no requirement that the plan administrator rely on an internal rule or protocol. Here, Mohlke has pointed to no evidence that MetLife relied on any such norm other than the Plan, itself. In fact, the evidence establishes that MetLife did not. Document #27-1.

Finally, Mohlke argues that the Court should conduct a *de novo* review because MetLife did not provide him with a "description of any additional material or information necessary to perfect the Claim, together with an explanation as to why such material or information is necessary." Met-M-600-01, 621-22. However, MetLife explained to Mohlke that if he decided to appeal the decision, he should provide MetLife with copies of his office visit notes, test results, global impairments and restrictions and limitations from all treating providers. Met-M-365. These documents are the sort of material that would tend to perfect Mohlke's claim. Furthermore, there is no evidence that relevant documents exist that MetLife did not consider in both its initial determination and its decision on appeal. Therefore, Mohlke cannot establish that this procedural irregularity, if such it was, meets the second prong of the *Woo* test. *Cf. Miller*, 72 F.3d at 1071 (ERISA remand not required where it would be a "useless formality").

## III.

Because Mohlke has not demonstrated the existence of a procedural irregularity that caused a serious breach of MetLife's fiduciary duty, the Court reviews MetLife's decision for abuse of

discretion.   When reviewing for an abuse of discretion, the Court inquires as to whether the plan

administrator's decision was reasonable or supported by substantial evidence.   *Ortlieb v. United*

*HealthCare Choice Plans*, 387 F.3d 778, 781 (8th Cir. 2004) (citation omitted).   "Substantial

evidence is 'more than a scintilla but less than a preponderance.' " *Smith v. UNUM Life Ins. Co. of*

*Am.*, 305 F.3d 789, 794 (8th Cir. 2002) (quoting *Schatz v. Mut. of Omaha Ins. Co.*, 220 F.3d 944,

949 (8th Cir. 2000)).   Stated differently, substantial evidence "means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Fletcher-Merrit v. NorAm*

*Energy Corp.*, 250 F.3d 1174, 1179 (8th Cir. 2001) (quotation omitted).   Relevant evidence includes

"all comments, documents, records, and other information submitted by the claimant relating to the

claim."   29 C.F.R.  § 2560.503-1(h)(2)(iv).   A plan administrator's decision is reasonable if a

reasonable person could have reached a similar decision given the evidence in the record, "even if

the court would interpret the language differently as an original matter." *Darvell v. Life Ins. Co. of*

*N. Am.*, 597 F.3d 929, 935 (8th Cir. 2010); *Ferrari v. Teachers Ins. & Annuity Ass'n*, 278 F.3d 801,

807 (8th Cir. 2002).   In deciding whether the administrator's interpretation of the plan is reasonable,

the Court is guided by factors such as whether the administrator's interpretation: (1) is contrary to

the plan's clear language; (2) conflicts with ERISA's substantive or procedural requirements; (3)

renders plan language "meaningless or internally inconsistent;" (4) is consistent with plan goals; and

(5) has been followed consistently by the administrator. *Darvell*, 597 F.3d at 935 (citing *Finley*, 957

F.2d at 621).   Of course, while abuse-of-discretion review is deferential in the ERISA context, it "is

not tantamount to rubber-stamping the result." *Torres*, 405 F.3d at 680.

Based on Drs. Rumans and Barnes's reports, the ENG test results, and the evidence about

the requirements of Mohlke's duties as a mechanic, MetLife granted Mohlke's claim for benefits

in 2006.  The issue here is whether MetLife abused its discretion when it decided to terminate

Mohlke's benefits.  The Plan provides:

### 9.4    Payment of Benefits

* * *

**(j)    Termination of Benefit Payments**

**(1)    Disability Ceases.**  With respect to an LTD Payee whose Disability ceases (other than an LTD Payee engaging in Gainful Work), Benefits shall terminate after payment of the Monthly Benefit Payment which pertains to the second month following the month in which such Disability ceases.

* * *

**(2)    Other Termination.**  Benefits shall terminate as of the Monthly Benefit Payment with respect to the month in which any of the following first occurs.

(A)    Disability ceases because the LTD Payee is engaging in Gainful Work[.]

Met-M-593.  The Plan defines "disability" and "gainful work" as follows:[5]

### 2.3    Disability

"Disability" means a condition fulfilling the following requirements:

(a)    The condition results in a Participant's total and continual inability to engage in Gainful Work;

(b)    Due to the condition, the Patient remains under the care of a licensed physician;

(c)    If the Disability occurred on or after January 1, 2004, the Participant is receiving Appropriate Care and Treatment and complying with the requirements of such treatment;

(d)    The Participant's condition is due to sickness or as a direct result of accidental injury and did not result from the Participant's participation in an insurrection, rebellion or riot, or the Participant's commission of a crime of which he is convicted in a court of law;

_____

[5] There is no dispute that Mohlke was an LTD Payee.

19

(e)    If the Disability occurred on or after January 1, 2004, the Participant is (I) unable to perform Gainful Work for any employer in the Participant's Local Economy, and (ii) earn more than 60% of his or her pre-disability IASR; and

(f)    The condition:

(1)    Has lasted for a continuous period of 26 weeks or more inclusive of time during which the Participant was an STD Recipient or he received WCIB; or

(2)    With respect to an STD Recipient whose employment is terminated as a result of a layoff under TAP or through as involuntary Special Separation Program, the condition has lasted for less than 26 weeks, but reasonably can be expected to last at least 26 weeks.

Met-M-616.

### 2.5    Gainful Work

"Gainful Work" means paid employment for which a person is, or becomes, reasonably qualified by education, training, or experience, and which is more than transitory in nature, as determined by the Claims Administrator.  Notwithstanding the foregoing, Gainful Work does not include Rehabilitative Employment.

Met-M-567.

After citing the Plan's definition of disability, MetLife's decision recounted Mohlke's medical history.  Met-M-258-61.  MetLife then noted that an investigation yielded evidence that Mohlke was able to drive, walk, and work part-time as a device repairman.  Further, he was certified to service RPZ pumps.  MetLife noted that Dr. Rumans had stated earlier that year that Mohlke was permanently limited from engaging in activity requiring balance.   MetLife also pointed to Dr. Barnes's statements that Mohlke was disabled primarily as a result of depression and anxiety.  These physicians filled out statements indicating that Mohlke was disabled and could not work because of his conditions.  However, MetLife pointed out that two otolaryngologists and one

psychiatrist had reviewed Mohlke's entire medical file and conferred with Drs. Rumans and Barnes. The two otolaryngologists found that there was no objective medical evidence supporting a finding that Mohlke's balancing issues continued to prevent him from working.  MetLife states in its letter to Mohlke that the independent physician consultant noted that the vertigo had been "ameliorated to the degree that you have no further clinical findings such as no nystagmus and no difficulty with ambulation."  Met-M-260.  Similarly, the letter noted that the psychiatrist found no objective medical evidence that Mohlke suffered from depression or anxiety and that there was no evidence that Mohlke was limited in his ability to function because of some mental impairment.  Further, the psychiatrist noted that Dr. Barnes said that Mohlke had responded well to treatment and was now psychiatrically stable.  MetLife noted that it had sent copies of the reports to Drs. Rumans and Barnes asking if they disagreed, but neither physician responded.  Based on this evidence, MetLife concluded that Mohlke had failed to establish that he continued to be disabled.  *Id.*; *see also Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992) (generally, a claimant under an ERISA plan has the burden of demonstrating that he is entitled to benefits under the terms of the Plan) (citing 29 U.S.C. § 1132(a)(1)(B)).

Mohlke contends that MetLife's interpretation and application of the Plan provisions in his case were unreasonable because "there is no language in the Plan requiring objective evidence." Although it is true that the Plan does not require objective evidence, neither does the Plan prohibit MetLife from terminating benefits based on the lack of objective medical evidence.  The Plan does not require MetLife to find a claimant disabled based on his subjective complaints.  The Eighth Circuit has held on numerous occasions that "[i]t is not unreasonable for a plan administrator to deny benefits based upon a lack of objective evidence."  *Manning v. Am. Republic Ins. Co.*, 604 F.3d

1030, 1041 (8th Cir 2010) (quoting *Johnson v. Metro. Life Ins. Co.*, 437 F.3d 809, 813 (8th Cir.

2006) (quoting *McGee v. Reliance Standard Life Ins. Co.*, 360 F.3d 921, 925 (8th Cir. 2004))).  On

the record here, the Court cannot say that MetLife acted unreasonably in finding that Mohlke was

not disabled under the terms of the Plan based on the physicians' reports and the investigation.  *See*

*Hunt v. Metro. Life Ins. Co.*, 425 F.3d 489, 491 (8th Cir. 2005) (per curiam) (upholding a denial of

benefits where objective medical evidence did not support claimed disability); *Coker v. Metro. Life*

*Ins. Co.*, 281 F.3d 793, 799 (8th Cir. 2002) (finding denial of benefits not unreasonable where

objective medical evidence did not support claimant's contention that he was disabled).  Indeed,

Mohlke was certified and working as a repair mechanic, albeit on a part-time basis.[6]

Mohlke argues that MetLife abused its discretion in terminating his benefits because there

is no evidence that Mohlke can earn sixty percent of his pre-disability insurance annual salary rate[7]

in the local economy.  Mohlke's assertion that he meets the definition of disability—because there

is no evidence that he can earn at least sixty percent of his pre-disability insurance annual salary rate

in the local economy—is mistaken.  MetLife relied upon two reports authored by otolaryngologists

stating that the medical evidence indicated that Mohlke's condition no longer imposed any

functional limitations on his ability to work full time.  Further, MetLife relied on a psychiatrist's

report which found that no mental impairment imposed any limitations on Mohlke's ability to work.

---

[6] *House v. Paul Revere Life Ins. Co.*, 241 F.3d 1045, 1048 (8th Cir. 2001), cited by Mohlke, is distinguishable from the instant case because there the administrator "possessed not even a scintilla of evidence refuting the extensive documentation of [the claimant's] severe heart disease supplied by the specialist who had treated [the claimant] for a decade." *See also Pralutsky v. Metro. Life Ins. Co.*, 435 F.3d 833, 839 (8th Cir. 2006) ("House does not state a universal rule that an administrator is precluded from insisting on objective medical evidence when it is appropriate under the terms of a plan and the circumstances of the case.").

[7] The Plan provides a definition of "Insurance Annual Salary Rate."  *See* Met-M-617-18.

Based on this evidence, a reasonable person could conclude that Mohlke was no longer totally and continuously unable to engage in gainful work. In fact, if Mohlke no longer suffered from any functional limitations on his ability to work full-time, then he was capable of earning more than sixty percent of his pre-disability IASR in his local economy. He could, for example, work as a mechanic again. The evidence that Mohlke was able to work as a repairman further supports this conclusion, particularly because it demonstrates that Mohlke actually could find work in his local economy. Even if there is no evidence that Mohlke actually was earning more than sixty percent of his pre-disability income; the evidence shows that he suffered from no medical condition which kept him from working full-time.

Mohlke contends that nothing has substantially changed since he became disabled and, consequently, that the termination of his benefits was inappropriate. *See McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002) ("We are not suggesting that paying benefits operates forever as an estoppel so that an insurer can never change its mind; but unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments."). Mohlke's claim that his condition has not substantially changed ignores Dr. Grossman's report that, in Mohlke's case, other balancing mechanisms "obviously are in place at this point in time" compensating for the balancing difficulties resulting from Mohlke's right vestibular nerve weakness. It also disregards Dr. Barnes's statements that Mohlke had responded to the Lexapro and was psychiatrically stable.

Mohlke also argues that MetLife abused its discretion because it did not rely on specific guidelines. As noted above, this contention is without merit. MetLife's counsel's letter only states

that the decision was not based on internal rules or guidelines. The Plan itself provides comprehensive guidelines directing MetLife's decision making. *See* Met-M-590-602.

Mohlke argues that MetLife abused its discretion by relying on the summary plan description. *See CIGNA Corp. v. Amara*, --- U.S. ----, 131 S. Ct. 1866, 1878, 179 L. Ed. 2d 843 (2011) ("[T]he summary documents, important as they are, provide communication with beneficiaries *about* the plan, but that their statements do not themselves constitute the *terms* of the plan for purposes of § 502(a)(1)(B)."). As discussed above, the reference to the summary plan description was merely a misstatement. The evidence shows that MetLife actually relied upon the Plan's terms in making its initial determination. Furthermore, this error was cured by MetLife's *de novo* review on appeal. The Court cannot say that this misstatement renders MetLife's determination unreasonable.

Similarly, Mohlke's contention that MetLife abused its discretion by failing to provide him with a copy of the investigation and video is without merit. As discussed above, the evidence indicates that Mohlke was provided with the requested materials. Even if he was not, Mohlke does not deny any of the facts established by the investigation which were relied upon by MetLife. Therefore, the alleged error, even if it occurred, is harmless. *Cf. Tillery*, 280 F.3d at 1198 ("Absent evidence to the contrary, any failure to provide the [summary plan description] was harmless.").

Finally, Mohlke argues that MetLife erred when it suspended his benefits immediately rather than waiting until after the second month following the month in which his disability ceased. MetLife contends that it did not err because Mohlke was engaging in gainful work. The relevant Plan provision states that "[w]ith respect to an LTD Payee whose Disability ceases (*other than an LTD Payee engaging in Gainful Work*), Benefits shall terminate after payment of the Monthly

24

Benefit Payment which pertains to the second month following the month in which such Disability ceases." Met-M-593 (emphasis added).  Also, "Benefits shall terminate as of the Monthly Benefit Payment with respect to the month in which any of the following first occurs . . . [d]isability ceases because the LTD Payee is engaging in Gainful Work[.]"  *Id.*  Under these provisions, it is clear that Mohlke would not have been entitled to the second monthly benefit payment if he was engaging in gainful work.  As stated, the Plan defines "gainful work" as "paid employment for which a person is, or becomes, reasonably qualified by education, training, or experience, and which is more than transitory in nature, as determined by the Claims Administrator." Met-M-567.  The evidence shows that Mohlke was a certified RPZ repairman who worked part-time as a tester for Southside Public Water Authority.  The Plan's definition of "gainful work" imposes no requirement that the employment be full-time.  Further, the Plan grants MetLife the discretion to determine whether certain work falls within the definition of "gainful work."  On this record, the Court cannot say that MetLife abused its discretion when concluding that Mohlke's part-time work as a certified RPZ repairman fell within the Plan's definition of "gainful work."

Other than Drs. Rumans and Barnes's statements that his conditions were "permanent," Mohlke presented no evidence tending to establish that he was still disabled in November of 2009. Indeed, Mohlke was working part-time as a repair mechanic.  The evidence established that Mohlke's condition had improved to the point that he was no longer disabled.  Therefore, MetLife did not abuse its discretion in terminating his benefits.

## CONCLUSION

For the reasons stated, MetLife's decision to terminate Mohlke's long-term disability benefits is AFFIRMED.

IT IS SO ORDERED this 28th day of February, 2012.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE